UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>                Plaintiff,<br><br>     v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and GINA MCCARTHY, in her official capacity as Administrator of the United States Environmental Protection Agency,<br><br>                Defendants. | **OPINION & ORDER**<br><br>16 Civ. 1251 (ER) |

RAMOS, D.J.

      In 2011, the United States Environmental Protection Agency and its Administrator (collectively, "EPA") decided to regulate the presence of the chemical perchlorate in drinking water, triggering statutory rulemaking deadlines under the Safe Drinking Water Act of 1974 (the "Act").  Five years later, the National Resources Defense Council, Inc. ("NRDC"), a national not-for-profit environmental and public health organization, brought this citizen suit against the EPA for its failure to comply with the rulemaking mandate of the Act.  Ultimately, the parties entered a consent decree through which the EPA agreed to propose and issue final standards. Before finalizing its proposed regulations, however, the EPA withdrew its decision to regulate perchlorate at all.  Now pending before this Court are the EPA's motion to terminate the consent decree based on this change of circumstance, and the NRDC's cross-motion to enforce the consent decree as written.  Concurrently, the NRDC is challenging the EPA's decision not to regulate perchlorate before the D.C. Circuit in *NRDC v. Wheeler*, No. 20-1335, and the EPA has requested, in the alternative, that this Court stay these proceedings pending the Circuit's decision.

For the reasons set forth below, the Court stays this case pending decision in *Wheeler*.

I.      **Background**

In 1974, Congress passed the Act, 42 U.S.C. § 300f *et seq.*, authorizing the EPA to issue

standards to protect public water systems.  Under the Act, the EPA's Administrator must publish

a maximum contaminant level goal ("MCLG")[1] and promulgate a national primary drinking

water regulation ("NPDWR") for any particular contaminant once it determines that

> (i) the contaminant may have an adverse effect on the health of persons;
> (ii) the contaminant is known to occur or there is a substantial likelihood that the
> contaminant will occur in public water systems with a frequency and at levels of
> public health concern; and
> (iii) in the sole judgment of the Administrator, regulation of such contaminant
> presents a meaningful opportunity for health risk reduction for persons served by
> public water systems.

§ 300g-1(b)(1)(A).  To make its determination, the Administrator must rely on "the best available

public health information" and a database of the occurrence of contaminants in public water

systems. § 300g-1(b)(1)(B)(ii)(II).  If, based on these criteria, the Administrator chooses to

regulate a contaminant, she must propose an MCLG and an NPDWR within 24 months and

publish them within 42 months.  § 300g-1(b)(1)(E). "[P]rior to" proposing any contaminant level

or regulation, the Administrator must also request comment from the Science Advisory Board

(the "Board").[2]  § 300g-1(e).  Consultation with the Board, however, "shall, under no

circumstances, be used to delay final promulgation of any national primary drinking water

standard."  *Id*.  The Act further specifies that in carrying out the duties enumerated in 300g-1, the

Administrator must use "the best available, peer-reviewed science and supporting studies

---

[1] A contaminant is "any physical, chemical, biological, or radiological substance or matter in water."  § 300f(6).  The
maximum contaminant level is the "maximum permissible level of a contaminant in water which is delivered to any
user of a public water system."  § 300f(3).

[2] The Board was established by the Environmental Research, Development, and Demonstration Act of 1978 and
provides the EPA and certain Congressional committees with scientific advice.  § 300g-1(e); 42 U.S.C. § 4365(a).

conducted in accordance with sound and objective scientific practices; and data collected by acceptable methods or best available methods[.]"  § 300g-1(b)(3)(A)(i)-(ii).  Citizens may bring a civil action in district court against the Administrator if she "fail[s] . . . to perform any act or duty under this subchapter which is not discretionary."  § 300j-8(a)(2).  Lawsuits otherwise challenging "actions pertaining to the establishment of" NPDWRs and MCLGs must be filed in the D.C. Circuit.  § 300j-7(a)(1).

On February 11, 2011, the EPA decided to regulate the presence of perchlorate in public drinking water under § 300g-1(b)(1)(A) ("2011 Determination").  Doc. 1 at ¶¶ 4, 30, 52-53.  Perchlorate is a negatively charged inorganic ion consisting of one chlorine atom and four oxygen atoms.  Doc. 65-1 at 4.  Perchlorate can occur naturally as a result of atmospheric processes and can be found in mineral deposits.  *Id.*  It is also a byproduct of the rocket, missile and firework industries and can come from the degradation of hypochlorite solutions used to disinfect water.  *Id.*  People are typically exposed to perchlorate in their food or drinking water.  *Id.*  Ingesting a certain level of perchlorate can inhibit thyroid hormone production, which may cause changes in fetal brain development in pregnant women.  *Id.* at 4-5.

On May 29, 2012, the EPA consulted with the Board on interpreting more recent data on the health effects of perchlorate than had informed its 2011 Determination.  84 Fed. Reg. 30,524, 30,561 (June 26, 2019).  One year later, on May 29, 2013, the EPA "received significant input from" the Board and, to address the Board's recommendations, the EPA collaborated with the Food and Drug Administration scientists to develop models incorporating all available health information about perchlorate.  *Id.*

On February 18, 2016, the NRDC filed the instant complaint alleging that the EPA failed to comply with its nondiscretionary duties under the Act to propose and finalize an MCLG and

an NPDWR regarding perchlorate following the 2011 Determination.  Doc. 1.  On September 19, 2016, the Court issued a short order finding that the EPA's failure to set an MCLG and an NPDWR under § 300g-1(b)(1)(E) constituted failure to perform non-discretionary duties.  Doc. 24 at ¶ 3.  On October 18, 2016, the parties entered a consent decree by which the EPA agreed to complete the external peer-review process, propose MCLG and NPDWR by October 31, 2018, and publish final MCLG and NPDWR by December 19, 2019.  Doc. 38 at ¶¶ 3-5.  Under the terms of the consent decree, the Court "retains jurisdiction to enforce" its terms and the parties may move to modify it "for good cause shown, which may include a showing that the provision sought to be modified is no longer in the public interest[.]"  *Id.* at  ¶¶ 8, 11.  The consent decree also expressly provides that "[n]othing in this Consent Decree shall be construed to limit or modify any discretion accorded [the] EPA by the [Act] or by general principles of administrative law."  *Id.* at ¶ 13.

In January 2017, the EPA convened an independent peer-review panel to evaluate its perchlorate health effects model.  84 Fed. Reg. 30,524, 30,528.  Following the feedback of the first panel, the EPA engaged a second peer-review panel in January 2018 to evaluate its revised model.  *Id.*  On September 11, 2018, the Court extended the deadline to propose an MCLG and an NPDWR to April 30, 2019.  Doc. 57 at 3.

On June 26, 2019, the EPA proposed an MCLG and an NPDWR.  84 Fed. Reg. 30,524.  However, "in light of new considerations that have come to the EPA's attention since it issued its positive regulatory determination in 2011, including information on lower levels of occurrence of perchlorate than the EPA had previously believed to exist and new analysis of the concentration that represents a level of health concern[,]" the EPA requested comment on, in the alternative, withdrawing the 2011 Determination.  *Id.* at 30,525.  On October 1, 2019, the parties stipulated

to extend the deadline to publish an MCLG and an NPDWR until June 19, 2020.  Doc. 60 at 1-2.

On June 18, 2020, just one day before final regulations were due to be published pursuant

to the consent decree, the EPA withdrew its 2011 Determination and issued a determination,

"based on the best available information[,]" that it would not regulate perchlorate because it

"does not occur 'with a frequency and at levels of public health concern'" and "does not present

'a meaningful opportunity for health risk reduction for persons served by public water systems'"

under the Act (the "2020 Determination").  Doc. 65-1 at 1 (citing § 300g-1(b)(1)(A)).  The EPA

then moved to terminate the consent decree, arguing that it now had no authority to regulate

perchlorate, that the change of circumstances warranted relief from final judgment, and that the

consent decree allows for modification for such good cause shown.[3]  Docs. 63; 64.

On July 9, the NRDC filed its opposition to the EPA's motion and cross-moved to enforce

the consent decree or stay the case.  Docs. 70; 71.  The NRDC argues that the EPA does not have

the authority to withdraw the 2011 Determination and therefore must comply with the consent

decree.  Doc. 71.  The NRDC also proposed, in the alternative, that the Court compel the EPA to

issue a final MCLG and NPDWR but modify the consent decree to stay the effective date of

those rules until after the D.C. Circuit issues a decision in *Wheeler*.  *Id.* at 26.  On July 30, the

EPA opposed the NRDC's motion.[4]

On September 22, the EPA informed this Court that the NRDC had filed a complaint

challenging the substance of the 2020 determination in the D.C. Circuit, *NRDC v. Wheeler*, No.

20-1335 and requested that, in the alternative, the Court stay the case pending the D.C. Circuit's

decision in *Wheeler*.  Doc. 76.  On September 23, the NRDC opposed the EPA's request to stay

---

[3] The EPA's further request to stay the June 19, 2020 deadline to promulgate final regulations was granted.  Doc. 67.

[4] On August 13, 2020 the NRDC further requested oral argument on the enforcement motion.  Doc. 74.

the case arguing that it would instead ask the D.C. Circuit to hold *Wheeler* in abeyance pending

this Court's decision on the parties' motions.  Doc. 78.  On October 9, the NRDC moved for

abeyance in *Wheeler* and, on October 22, the EPA opposed.  Docs. 79; 79-1; 80; 80-1.

## II.     Standard of Review

### A.      The Court's Discretion to Stay

A stay is "an exercise of judicial discretion," and "[t]he propriety of its issue is dependent

upon the circumstances of the particular case."  *Virginian Ry. Co. v. U.S.*, 272 U.S. 658, 672-73

(1926).  A court may stay proceedings in one suit to abide by the proceedings in another even if

the parties or the issues in the two cases are not identical.  *Caspian Invs., Ltd. v. Vicom Holdings,*

*Ltd.,* 770 F. Supp. 880, 884 (S.D.N.Y. 1991) (citing *Landis v. North Am. Co.*, 299 U.S. 248, 254

(1936)).  Yet the Court's discretion is not unguided.  *Kappel v. Comfort*, 914 F. Supp. 1056, 1058

(S.D.N.Y. 1996).

Courts examining motions to stay consider five factors:  "(1) the private interests of the

plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to

the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests

of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public

interest."  *Royal Park Invs. SA/NV v. Bank of Am. Corp.,* 941 F. Supp. 2d 367, 370 (S.D.N.Y.

2013); *see also Tradewinds Airlines, Inc. v. Soros,* No. 08 Civ. 5901 (JFK), 2009 WL 435298, at

*4 (S.D.N.Y. Feb. 23, 2009) (staying a civil case pending the disposition of a contested default

judgment before the Superior Court of the State of North Carolina).  In balancing these factors,

courts must make a case-by-case determination, in which "the basic goal" is to avoid prejudice.

*Volmar Distribs., Inc. v. New York Post Co.,* 152 F.R.D. 36, 39 (S.D.N.Y. 1993).  "The proponent

of a stay bears the burden of establishing its need."  *Clinton v. Jones,* 520 U.S. 681, 708 (1997).

### B.      Motions for Relief from Judgment under Rule 60(b)(5)

"Motions for relief under Rule 60(b) are disfavored, and are reserved for exceptional

cases."  *Crawford v. Franklin Credit Mgmt., Corp.*, No. 08 Civ. 6293 (JFK), 2013 WL 2951957,

at *1 (S.D.N.Y. June 14, 2013) (quoting *Canale v. Manco Power Sports, LLC*, No. 06 Civ. 6131

(PKL), 2010 WL 2771871, at *2 (S.D.N.Y. July 13, 2010)).  Under Rule 60(b)(5), a court "may

relieve a party or its legal representative from a final judgment, order, or proceeding" if "the

judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has

been reversed or vacated; or applying it prospectively is no longer equitable[.]"  Fed. R. Civ. P.

60(b)(5).  "It is usually applied where a party seeks relief from either an injunction or a consent

decree and can show 'a significant change either in factual conditions or in law.'"  *Thompson v.

City of New York*, No. 04 Civ. 2355 (FB) (RML), 2010 WL 1005866, at *2 (E.D.N.Y. Mar. 16,

2010) (quoting *Agostini v. Felton*, 521 U.S. 203, 215 (1997)).

### III.     Discussion

As a threshold matter, under the Act, this Court only has the authority to adjudicate cases

alleging the EPA's failure to perform a non-discretionary duty.  § 300j-8(a)(2).  The NRDC

argues that once the EPA issued the 2011 Determination, it had a mandatory duty to propose and

finalize an MCLG and an NPDWR and had no authority to withdraw that determination.  While

the NRDC emphasizes that the text of the Act does not expressly contemplate revisiting a

determination to regulate, the EPA has pointed to the Act's mandate that it must adhere to the

best available peer-reviewed science while carrying out its duties.  § 300g-1(b)(3)(A)(i).  The

parties agree that the issuance of final regulations is one such duty.

Moreover, as the Supreme Court has held, "[a]gencies are free to change their existing

policies as long as they provide a reasoned explanation for the change."  *Encino Motorcars, LLC*

7

*v. Navarro*, 136 S. Ct. 2117, 2125 (2016). The NRDC argues that this Circuit has "repeatedly rejected" agency assertions of inherent authority to reconsider decisions to regulate. Doc. 71 at 17. However, the Second Circuit decisions upon which the NRDC relies involved agencies reconsidering or undermining final, not proposed, regulations. *NRDC v. NHTSA*, 894 F.3d 95, 100, 112-13 (2d Cir. 2018) (finding NHTSA acted unlawfully by publishing a rule indefinitely delaying effective date of civil penalty regulation promulgated months prior); *NRDC v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004) ("the EPCA consumer appliance provisions do not provide for reconsideration following prescription of a final rule[.]").

The NRDC's reliance on *NRDC v. EPA*, 542 F.3d 1235 (9th Cir. 2008) is similarly misplaced. In that case, the EPA published proposed limitations on storm water pollution resulting from construction sites under the Clean Water Act, but then withdrew its proposed rule and removed the construction industry from the list of industries it would regulate. *Id.* at 1238-40. The district court granted summary judgment in favor of plaintiffs, and the Ninth Circuit affirmed concluding that the EPA had a non-discretionary duty to promulgate such limitations and that the EPA had no authority to remove the construction industry as one it could regulate "with no process." *Id.* at 1252-53. But here the EPA argues that it is doing precisely the opposite, that it engaged in the extensive process prescribed in the Act and relied on the best available scientific data to conclude that perchlorate did not meet the criteria for regulation. To the extent the NRDC wishes to challenge the substantive findings of the EPA's process, that inquiry is meant for the D.C. Circuit. § 300j-7(a)(1).

Indeed, both motions pending before this Court are predicated on the validity of the 2020 Determination, an inquiry beyond this Court's jurisdiction under the Act. § 300j-8(a)(2). The NRDC asks this Court to enforce the consent decree as though the 2020 Determination does not

exist, but for better or worse it does.  The EPA urges this Court to instead terminate the consent

decree because the 2020 Determination marks a change in circumstances warranting

modification under Rule 60(b)(5) or good cause under the consent decree, but the D.C. Circuit

may determine it is invalid.  In the face of these circumstances, the EPA argues that a stay

pending decision in *Wheeler* would preserve judicial economy.  Doc. 76.  The NRDC counters

that it would be prejudiced by such a stay given the length of time that the EPA has already

delayed regulation and the length of time cases pend before the D.C. Circuit, whereas the EPA

would not be burdened because this briefing is complete.  Doc. 78.  The NRDC further argues

that there is no inherent efficiency in resolving *Wheeler* first and that public interest would be

best served by regulation.  Doc. 78.  Although the NRDC is right that it has been almost ten years

since the issuance of the 2011 Determination, it has only been four months since the EPA was

expected to promulgate an MCLG and an NPDWR under the consent decree.  Of course the

public has an interest in safe drinking water, but the public also has an interest in well-reasoned

regulation and efficient use of the courts.  Resolution of *Wheeler* prior to resolution of the

motions before this Court is not only more efficient, but necessary to arrive at the right answer.

*Delgado v. N.J. Transit Rail Operations, Inc.*, 329 F.R.D. 506, 508 (S.D.N.Y. 2019) (granting

stay where outcome of Third Circuit case was "likely to have a significant impact on the

disposition of this case").  The Court therefore stays this case pending the D.C. Circuit's decision

in *Wheeler*.

Finally, the NRDC initially proposed that this Court direct the EPA to issue a final MCLG

and NPDWR, and modify the consent decree to stay their effective dates so that if the D.C.

Circuit issues a decision in *Wheeler* striking down the 2020 Determination, the EPA could

quickly comply with the consent decree.  Doc. 71 at 26.  While the Court understands that it has

been almost ten years since the EPA issued the 2011 Determination and final regulations have yet

to be promulgated, the Court is hesitant to order the EPA to spend time and resources on

regulations that may never need to be enforced.  *Cf. id.* (declining to move forward with

discovery or motion practice because it would "incur a burden that may turn out to be

unnecessary" on defendant).  Accordingly, the Court denies the NRDC's request and declines to

direct the EPA to issue a final MCLG and NPDWR while the Court awaits the *Wheeler* decision.

## IV.     Conclusion

For all of these reasons, the Court stays this case, including its decision on the EPA's

motion to terminate the consent decree, Doc. 63, and the NRDC's motion to enforce it, Doc. 70,

pending the D.C. Circuit's decision resolving *Wheeler*.

It is SO ORDERED.


Dated:  October 27, 2020
        New York, New York

                                                   _____
                                                      Edgardo Ramos, U.S.D.J.